UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ALBERT J. QUINN,
    Plaintiff,

vs.

CITY OF NEWPORT, JOSEPH J.
NICHOLSON, JR., in his capacity as
Newport City Manager, LAUREN L.
SITRIN, in her capacity as Newport
Director of Finance, GARY SILVA,
both individually and in his capacity
as Chief of Police of the Newport
Police Department, and JOHN DOE,
1-5, unnamed current or former City
officials or employees,
    Defendants.

C.A. No. 17-012-JJM-PAS

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 11 and 16. Sergeant Albert J. Quinn brought this case alleging seven counts related to his termination from the Newport Retired Officer Corps: First Amendment Violation, Fifth Amendment Violation, Wrongful Termination in Violation of R.I.G.L. § 28-50-3), Breach of Contract, Bad Faith, and Defamation.[1] The Defendants ("City") moved for summary judgment on each of the counts and Sgt. Quinn filed a cross-motion for summary judgment on Counts II, III, and IV. ECF

---

[1] The Complaint also alleged Intentional Infliction of Emotional Distress (Count VII) that the parties agreed to waive.

Nos. 11 and 16. The parties filed extensive responses and objections (ECF Nos. 18, 21, 23, 25, 29, and 31) and the Court heard the parties' arguments. For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Sgt. Quinn's Motion (ECF No. 16) and GRANTS IN PART AND DENIES IN PART the City's Motion. ECF No. 11.

I. BACKGROUND

Sgt. Quinn served as a police officer in the Newport Police Department (NPD) from 1980–2011. Upon retirement, Sgt. Quinn was accepted and sworn into the Newport Retired Officer Corps ("ROC").[2] Sgt. Quinn, in accepting a position in the ROC, signed a "Letter of Agreement for Retired Newport Police Officers Working Special Details" ("Agreement"). The Agreement states: "I understand that my position is as a Special Detail Retired Officer and that my employment is strictly 'at will,' meaning that either the city or I may terminate my role at any time for any reason." ECF No. 1-6 at 2.

In 2014, a Newport restaurant co-owned by Sgt. Quinn was the victim of a telephone fraud scam. An employee of the restaurant filed a criminal complaint and the NPD opened a criminal investigation into the scam. Detective Sergeant Frank Rosa was assigned to conduct the investigation.

Once the NPD opened the investigation, Sgt. Quinn appeared to try to interfere with the investigation. Sgt. Quinn contacted Steven Riccardi, a retired Secret Service

---

[2] The ROC is a program for retired police officers to work special details within the NPD.

Agent, to ask if the Secret Service ever investigated these crimes and Mr. Riccardi replied that he may be able to supply resources and aid in the investigation. As such, Sgt. Quinn provided Det. Rosa with Mr. Riccardi's contact information, but Det. Rosa never reached out for help. Sgt. Quinn also reached out to State Representative Peter Martin regarding the investigation and scam.

Shortly thereafter, Sgt. Quinn was asked to speak as a victim of the telephone fraud at a press conference held by the Rhode Island State Attorney General. Sgt. Quinn provided a brief statement that was broadcast on television.[3] After the press conference, Sgt. Quinn sat down with a Special Assistant Attorney General who asked about the status of the case. Sgt. Quinn, at the Special Assistant Attorney General's request, provided him with Det. Rosa's contact information but did not ask the Attorney General's Office to contact the NPD.

The day after the press conference, an email was circulated among members of the NPD stating, "ROC Quinn was in the [NPD] station earlier in the week and was up in [the Criminal Investigation Division] inquiring about his criminal case. Please remind ROC Quinn that using his FOB to enter the station for such purposes is not only inappropriate but forbidden. If he has personal business, he is to go through normal channels as every other citizen." ECF No. 12 at ¶ 25. Sgt. Quinn was not informed of this email.

---

[3] In his interview, Sgt. Quinn was introduced as a business owner and retired police officer, but no mention was made of his city employment status or status in the ROC. ECF No. 24 at ¶ 5.

Sometime after the press conference, Sgt. Quinn entered the NPD with State Representative Peter Martin.[4]

Shortly thereafter, Chief Silva terminated Sgt. Quinn as a member of the ROC. A police officer escorted Sgt. Quinn out of the building. In the termination meeting, Chief Silva did not mention the email but claimed that Sgt. Quinn had interfered with the investigation and had "gone way outside the bounds of an investigation." ECF No. 12 at ¶ 30. Chief Silva also stated that the reasons for terminating Sgt. Quinn were that Sgt. Quinn brought a state representative into the NPD with the intent of intimidating an investigation and that Chief Silva had received phone calls from the Attorney General's Office and the Secret Service on the same day that two Secret Service agents showed up unexpectedly at the NPD.

A few months after the termination, Sgt. Quinn contacted the then-acting Newport City Manager Joseph J. Nicholson, Jr. to appeal his adverse employment action. The City Manager told Sgt. Quinn that he had not received documentation of the adverse employment action and that he would reach out to Chief Silva. Around that same time, Sgt. Quinn spoke with the Director of Human Resources Michael Coury who also said that he had received no documentation of adverse employment action against Sgt. Quinn. A few months later, the City Manager informed Sgt. Quinn that he was approved to return to work. When Sgt. Quinn took steps to arrange for recertification and return to work, he was denied and did not return to work at NPD.

---

[4] The parties dispute why Representative Martin entered the NPD.

## II. STANDARD OF REVIEW

Summary judgment is warranted when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The court must look to the record and view all the facts and inferences in the light most favorable to the non-moving party. *Cont'l Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991).

When evaluating "cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Tr. Fund ex rel. Bolton*, 736 F.3d 33, 36 (1st Cir. 2013) (quoting *Roman Catholic Bishop of Springfield v. Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)). The court must determine whether either party is entitled to judgment as a matter of law based on the undisputed facts. *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009).

## III. DISCUSSION

The City has moved for summary judgment on all counts and Sgt. Quinn has filed a cross-motion for summary judgment on Counts II, III, IV. The Court will address each Count in turn.

### A. Count I–First Amendment

Sgt. Quinn alleges that the City took the adverse employment action against him to punish him for speaking with the Attorney General's Office and to the public

in his role as a victim of a crime. ECF No. 1 at ¶¶ 107-08. "A public official seeking to make a claim out of retaliation in violation of her First Amendment rights must meet a four-factor test." *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1988). That is, (1) the public employee must have been speaking on a matter of public concern; (2) the employee's First Amendment interest must not be outweighed by the governmental interest in promoting the efficiency of the public services it performs through its employees without disruption; (3) the employee's speech was a substantial and motivating factor in prompting the punitive act; and (4) the City can prove by a preponderance of the evidence that it would have reached the same decision even without the protected conduct. *Id.*

The Court need not address each elemental argument in *O'Donnell* because the evidence fails to support the claim that Sgt. Quinn was terminated because of his statement to the media or the Attorney General's Office. As enumerated in *O'Donnell*, the employee's speech must be a substantial and motivating factor in the termination. *Id.* In the termination meeting here, however:

> Chief Silva made no mention of the email, but instead claimed that Plaintiff had interfered with an investigation, had gone way outside the bounds of an investigation, sought to intimidate an investigation by bringing a State Representative to the Police Station, and that Chief Silva had gotten phone calls from both the Attorney General's Office and the Secret Service on the day that two Secret Service agents had come to the Police Station.

ECF No. 24 at ¶ 32.

Thus, and by Sgt. Quinn's own admission, the alleged protected conduct—the television interview as well as the interview with the Attorney General's Office—was

not a substantial and motivating factor in the termination. Therefore, the Court GRANTS the City's Motion for Summary Judgment on Count I.

### B. Count II–Due Process

Sgt. Quinn also alleges that Defendants' failure to adhere to processes laid out in the City of Newport, Rhode Island–Code of Ordinances (the "Ordinances") violated his due process rights. ECF No. 1 at ¶ 118. Procedural due process requires a plaintiff to show deprivation of a protected property interest and denial of due process for that property interest. *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008). To show a protected property interest under circumstances of employment, an employee must have a legitimate claim of entitlement to continued employment—continued employment is thus the property interest. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). At-will employment creates no property interest protected by due process because it does not guarantee future employment. *Haddle v. Garrison*, 525 U.S. 121, 125-126 (1998).

The City argues that the language of the Agreement controls the employment status of Sgt. Quinn. ECF No. 13 at 7-8. In support, the City cites the Agreement signed by Sgt. Quinn that specifically states: "as a Special Detail Retired Officer...my employment is strictly 'at will,' meaning that either the city or I may terminate my role at any time for any reason." ECF No. 1-6 at 2. There is no dispute about the plain meaning of the at-will employment provision in the Agreement.[5]

---

[5] The City also asks the Court to review the affidavits and extrinsic documents provided by the City to further its contention that Sgt. Quinn was, and was intended to be, an at-will public employee. Yet where the plain text of a contract is

7

Sgt. Quinn, in response, contends that the City could not fire him at will because, under the Ordinances, he is a part-time employee and thus a classified employee subject only to the termination process in the Ordinances. ECF No. 16-2 at 4. He argues that the Ordinances trump the at-will Agreement. In so arguing, Sgt. Quinn relies exclusively on the opinion of my colleague on the district court, Chief Judge William E. Smith in *Waterbury v. City of East Providence*, 197 F. Supp. 3d 379, 382 (D.R.I. 2016), opining that

> While it is clear to the Court that the parties intended to form an at-will employment relationship, the question of whether the "at-will" clause of the contract is valid lingers because [Ordinances of the City of East Providence] is so restrictive and explicit with respect to City employment. City ordinances are, in effect, statutes in their application to the municipality. They are the law of the land, at least that bounded by the municipal boundaries. And just as the at-will rule in Rhode Island is clearly understood, so is the principle that parties may not contract around the law.

*Id.* (referencing *State v. Rhode Island All. of Soc. Servs. Employees, Local 580, SEIU*, 747 A.2d 465, 469 (R.I. 2000)). Sgt. Quinn does not dispute the at-will provision in the Agreement. That said, relying on *Waterbury*, he contends the Agreement

---

unambiguous, the Court may not consider this external evidence. *See Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004) (stating that "if the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written."). Rhode Island law is clear that at-will employment means an employer may fire an employee for good reason or bad, or no reason at all, if it is not a legally prohibited one. *See Roy v. Woonsocket Inst. for Sav.*, 525 A.2d 915, 917, 918 n. 2 (R.I. 1987). Consistent with the law of Rhode Island, the at-will employment provision in the Agreement is clear and unambiguous and the Court need not look outside this contract to interpret the meaning or intention of the term "at will." *See Waterbury v. City of E. Providence*, 197 F. Supp. 3d 379, 382 (D.R.I. 2016).

contravene the Ordinances—an attempt to "contract around the law"—which the law does not allow. *See Waterbury*, 197 F. Supp. 3d at 382.

The Court agrees with Sgt. Quinn that the Ordinances are the governing law on the issue of the ROC's classification, not the Agreement. If a statute has or provides for a nondelegable and/or nonmodifiable duty, a contractual provision may not, thereafter, alter those mandates. *Rhode Island All. of Soc. Servs.*, 747 A.2d at 469. As a result, if the Ordinances categorize Sgt. Quinn as a classified employee, the City must afford him the process explicitly contained within the Ordinances, regardless of language or intentions of the City and Sgt. Quinn by the Agreement.

## *Chapter 3 of the Newport Ordinances*

A syntactical reading of the Ordinances proves availing for Sgt. Quinn. It is clear from the Ordinances that there are two classifications of public employees: Classified and Unclassified. As defined by Chapter 3.04.010, Classified Service means "all full-time and part-time offices and positions which are appointed directly or indirectly by the city manager." Unclassified Service, as defined by the same section, means "offices and positions that are appointed by council, including council itself. The term also includes temporary and seasonal employees." The definitions section is followed by two, distinct, sections listing unclassified and classified services. In Chapter 3.04.050, Unclassified Service includes

A. All elected officials and members of boards and commissions;
B. Persons appointed to fill vacancies in elected offices;
C. Officials appointed by council;
D. Volunteer personnel and personnel appointed to serve without pay, fire division callmen and police division auxiliary members;
E. Seasonal employees;

9

   F. Temporary employees; and
   G. On-call employees.

Under Chapter 3.04.060, Classified Service "includes all positions appointed by the city manager which do not fall under the unclassified service." There is no dispute on two pertinent facts, (1) the City Manager appointed Sgt. Quinn and, (2) the ROC program is not listed as Unclassified Service under 3.04.050.

There is, however, a dispute as to the type of employment Sgt. Quinn performed in the ROC. The City argues that Sgt. Quinn is a temporary employee and thus unclassified employee under subsection F of Chapter 3.04.050. ECF No. 21 at 1. A temporary employee is, as defined under Chapter 3.04.010, "an individual whose appointment to a temporary position does not exceed nineteen (19) weeks and whose position falls under the rules of unclassified employees. A temporary employee is only paid for the hours he or she works." If the City's contention is correct, that Sgt. Quinn is a temporary employee, the Court would agree that Sgt. Quinn would be unclassified and thus not entitled to the termination procedures in the Ordinances. But Sgt. Quinn was employed with the ROC program from his appointment in 2012, until his termination in 2014. The period of employment lasted well beyond the nineteen weeks needed to be categorized as a temporary employee.

In its oral argument, the City alternatively tries to bring Sgt. Quinn under the umbrella of on-call employees listed under Chapter 3.04.050. Chapter 3.04.010, however, does not define on-call employment and on-call employees appear only within a pay scale schedule under Chapter 3.16.070. That schedule does not include ROC officers.

10

The City cannot identify, exactly, the category Sgt. Quinn would fall into as a ROC officer. To further its argument, the City points to the pay schedules in Chapter 3.16.060 and 3.16.070 of the Ordinances. ECF No. 21 at 2. The City highlights Chapter 3.16.060 that provides a pay schedule for classified services. There, the Ordinances provide the pay schedules through a series of charts listing the pay associated with each grade/step. The different charts are titled: "Executive, Administrative and Professional Employees," "Supervisory Employees," "Council 94 Municipal Employees," "Fraternal Order of Police," and "International Association of Firefighters." The City points out that the "position of a ROC officer is not on this list." ECF No. 21 at 3.

The next Chapter of the Ordinances, Chapter 3.16.070, is titled "Pay schedule for part-time, temporary and unclassified service." The first chart lists unclassified positions. Those positions are

UNCLASSIFIED
Effective July 1, 2018

| City Manager | $178,500 per annum |
| --- | --- |
| City Solicitor | $85,744 per annum |
| Asst. City Solicitor for Civil Litigation | $68,701 per annum |
| Asst. City Solicitor for Law Enforcement | $33,884 per annum |

| Municipal Court Judge | $34,746 per annum |
| --- | --- |
| Probate Judge | $14,404 per annum |
| Canvassing Board Member | $1,370 per annum |

This unclassified pay schedule does not include ROC. If the City wanted to include the ROC position as an unclassified position, it certainly could have included it in this pay scale chart.

The City, in response, argues that it is the later pay schedule entitled "part-time, temporary and seasonal employees,"[6] that specifically lists 'Retired Officers Corp' and thus categorizes ROC officers as unclassified.

A reasonable interpretation of the "Part-time, Temporary and Seasonal Employees" pay schedule in Chapter 3.16.070 could include both classified and unclassified employees. "Part-time" is separated from "Temporary and Seasonal" by a comma, but an oxford comma does not separate the latter two. So, the pay schedule can be read to include the two, distinct, classifications of employees listed in the schedule—part-time and, by definition, classified; or temporary/seasonal and, by definition, unclassified. For example, and for want of an oxford comma,[7] each

---

[6] This chart has roughly 50 positions and the Court will not list the entirety for brevity sake.

[7] "For want of a comma, we have this case." *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017).

12

position listed in the pay schedule could be read as either: "part-time" ROC officer, or "temporary/seasonal" ROC officer. Thus, this pay schedule can be read to be inclusive of both classified and unclassified employees and makes no clear distinction between what positions are "Part-time," and thus classified, or "Temporary and Seasonal," and thus unclassified.

Chapter 3 of the Ordinances only allows the City to hire employees as classified or unclassified. In Chapters 3.04.050, the Ordinances explicitly lists the unclassified employees, and Chapter 3.04.060 provides that all other employees are classified. Without the ambiguity in the pay schedule titles, nothing in Chapter 3 alters the clear definitions of classified and unclassified employees. Even if the City intended to hire Sgt. Quinn as an unclassified employee, "this does not change the fact that the City had no authority to exclude [his] position from the classified service or to create a third category of employees outside the requirements of the [O]rdinance." *Waterbury*, 197 F. Supp. 3d at 383. As a result, because Sgt. Quinn is a classified employee with an expectation of continued employment, the City must afford due process in his termination.[8] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). The facts are undisputed that Sgt. Quinn did not receive due

---

[8] "The employee shall be furnished an advance written notice containing the nature of the proposed action, the reasons therefor and his or her right to answer the charges, orally or in writing. This notice shall be furnished at least one calendar week prior to the proposed effective date of the action." Newport City Ordinance 3.32.050(B).

13

process prior to his firing. Thus, the Court finds that the termination violated Sgt. Quinn's due process as afforded under the Ordinances.[9]

For the reasons stated above, the Court GRANTS Sgt. Quinn's Motion for Summary Judgment on Count II and DENIES the City's Motion for Summary Judgment on Count II.

### C. Additional Claims

Because of the Court's findings about Count II (Violation of Due Process), Count III, Wrongful Termination can proceed following the Court's findings above about the status of Sgt. Quinn's employment with the City. There are no facts that would support a breach of contract because Sgt. Quinn's rights do not flow from the contract, but rather from the Ordinances, and therefore Count IV (Breach of Contract) does not survive. Sgt. Quinn does not address Defendant City's Motion for Summary Judgment as to his Bad Faith claim and so the Court considers any objection waived and the City's Motion for Summary Judgment on Count V is granted.

Regarding Count VI, Defamation, the City argues that Chief Silva's comments alleging Sgt. Quinn interfered in an investigation constitute opinion and are too vague and imprecise to be proven true or false. However, Rhode Island law is clear that if a statement, even in the form of an opinion, implies the allegation of undisclosed defamatory facts as the basis for the opinion, it is actionable. *See*

---

[9] Nothing in this Order prevents the City from terminating Sgt. Quinn if it provides him with the required process.

14

*Beattie v. Fleet Nat. Bank*, 746 A.2d 717, 721 (R.I. 2000). Additionally, the Court fails to find that statements alleging Sgt. Quinn interfered with an investigation are too vague to be proven true or false. Accordingly, the City's Motion for Summary Judgment on Count VI is denied.

## IV. CONCLUSION

The Court GRANTS the City's Motion for Summary Judgment (ECF No. 11) as to Count I; GRANTS Sgt. Quinn's Motion for Summary Judgment (ECF No. 16) as to Count II; DENIES the City's Motion for Summary Judgment as to Counts II and III; GRANTS the City's Motion for Summary Judgment as to Count IV; DENIES Sgt. Quinn's Motion for Summary Judgment as to Counts III and IV; GRANTS as unopposed the City's Motion for Summary Judgment as to Count V; and DENIES the City's Motion for Summary Judgment as to Count VI.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

May 6, 2019